# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MICHAEL ROY PARKINSON,<br><br>                    Plaintiff,<br>v.<br><br>STEVEN SANDERSON; ALEX JACOB HUGGARD; and TRENT BLAINE PEARSON,<br><br>                    Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:15-CV-796<br><br>District Judge Jill N. Parrish |

## I.     BACKGROUND

Pro se Plaintiff Michael Roy Parkinson, proceeding in forma pauperis, initiated this action in December 2015. (ECF No. 3). The operative Second Amended Complaint ("SAC") alleges several counts under § 1983 for constitutional violations by Murray City police officers—Steven Sanderson, Alex Huggard and Trent Pearson—arising out of a traffic stop on February 26, 2015 and a subsequent search of Mr. Parkinson's apartment on March 2, 2015. (ECF No. 20). Specifically, Mr. Parkinson alleges that (1) Officers Sanderson and Huggard violated the Fourth Amendment through their "illegal search and seizure" of him and his vehicle on February 26, (SAC at 5–23); (2) Officers Sanderson and Huggard used "illegal and excessive force" during the February 26 traffic stop in violation of his Eighth Amendment rights, (SAC at 24); (3) Officers Sanderson and Huggard's "illegal search and assault" on February 26 violated his Fourteenth Amendment due process and equal protection rights, (SAC at 25); (4) the defendants violated the Fourth Amendment "through their illegal search and seizure" of his basement apartment on March

2, (SAC at 26–34); and (5) the defendants violated his Fifth and Fourteenth Amendment rights by "entrapping him" and "depriv[ing]" him of his "right to liberty." (SAC at 35).

On November 9, 2017, the defendants moved to dismiss all of Mr. Parkinson's claims. (ECF No. 34). First, they argue that the conduct at issue in this case—alleged illegal searches and use of excessive force—is properly evaluated under the Fourth Amendment, necessitating dismissal of his Eighth Amendment excessive force claim (Count II), Fourteenth Amendment illegal search and excessive force claim (Count III), and Fifth and Fourteenth Amendment entrapment and deprivation of liberty claim (Count V). As to Mr. Parkinson's Fourth Amendment claims, the defendants assert that they are entitled to qualified immunity. The defendants further argue that *Heck v. Humphrey*, 512 U.S. 477 (1994), also bars those claims because success in this case would necessarily imply the invalidity of Mr. Parkinson's state court convictions. *See* State v. Parkinson, No. 151902837 (Utah 3d Dist. Ct.). Finally, defendants argue that the remaining "fragments" of Mr. Parkinson's SAC fail to state a plausible claim for relief under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

In his opposition, Mr. Parkinson withdrew his Eighth Amendment excessive force claim as well as the entrapment and deprivation of liberty claims he had asserted under the Fifth and Fourteenth Amendments. (ECF No. 41 at 12). In his supplemental memorandum, Mr. Parkinson additionally conceded his Fourteenth Amendment illegal search and excessive force claim. (ECF No. 65 at 1 n.1). As a result, defendants are entitled to have those claims dismissed. Mr. Parkinson has not requested leave to amend these claims, and because the parties agree that the conduct of

which Mr. Parkinson complains may be analyzed under the appropriate Fourth Amendment framework,[1] these dismissals are with prejudice.

On June 22, 2018, Magistrate Judge Furse appointed pro bono counsel to assist Mr. Parkinson. (ECF No. 54). Mr. Parkinson subsequently sought and was granted leave to file a supplemental memorandum in opposition to the defendants' Motion to Dismiss, which he filed on September 5, 2018. (ECF No. 64). Defendants replied on September 12, 2018. (ECF No. 65).

The net result of the initial and supplemental briefing is that three of Mr. Parkinson's claims remain pending, each of which alleges a violation of the Fourth Amendment: (1) a search-and-seizure claim premised on the February 26, 2016 traffic stop; (2) an excessive-force claim related to the February 26, 2015 traffic stop; and (3) an unlawful search claim premised on the March 2, 2015 search of Mr. Parkinson's apartment.[2]

## II.     FACTUAL ALLEGATIONS IN THE SAC

### A. FEBRUARY 26, 2015 TRAFFIC STOP

Mr. Parkinson alleges that on February 26, 2015, a Jeep with "flashing lights" pulled him over. (SAC, ¶¶ 5–8, 13). Mr. Parkinson initially believed the flashing lights belonged to an emergency vehicle headed for the nearby hospital because he had "consciously and properly used all turn signal[s] and obeyed all traffic laws" as he drove. (SAC, ¶¶ 7, 12). Mr. Parkinson pulled over to let the vehicle pass, but then realized that the Jeep stopped behind him. (SAC, ¶¶ 9–10). He claims that he did not turn off the car and "left" the automatic transmission in neutral

---

[1] Defendants' supplemental memorandum accepted Mr. Parkinson's request that they stipulate to treating his excessive force claim as having been brought under the Fourth Amendment as part of Count I of the SAC. (*See* ECF No. 65 at 2 n.1).

[2] Mr. Parkinson's opposition concedes that Officer Sanderson played no role in the March 2, 2015 apartment search. (ECF No. 41 at 12). Accordingly, the first and second claims are brought against Officers Huggard and Sanderson, while the third claim is brought against Officer Huggard and Detective Pearson.

because it was a cold and snowy day and he had the heat running on high. (SAC, ¶¶ 10–11). Mr. Parkinson alleges that the driver of the Jeep, later identified as Office Sanderson, came up to his window and asked Mr. Parkinson if he knew why he pulled him over. (SAC, ¶¶ 14, 16). Mr. Parkinson replied that he did not know, and Officer Sanderson replied that he had not used his turn signal. (SAC, ¶¶ 17–18). Mr. Parkinson "asserts there never was a traffic violation because he used his turn signal properly at all relevant times." (SAC, ¶ 21).

Mr. Parkinson alleges that Officer Sanderson "demanded" his personal information and that he complied with the request. (SAC, ¶¶ 23–24). Mr. Parkinson claims that Officer Sanderson then "disappeared" for twenty minutes, and during that time he "became concerned" about who pulled him over. (SAC, ¶¶ 25–27). During this period, Mr. Parkinson claims to have seen a second man, later identified as Detective Pearson, through the passenger window. (SAC, ¶ 26). He claims that he then looked over his shoulder and saw a third man, later identified as Officer Huggard. (SAC, ¶ 28). Mr. Parkinson became even more concerned in part because each man was wearing civilian clothing. (SAC, ¶¶ 28–29). He alleges that Officers Sanderson and Huggard then approached the driver's side door. (SAC, ¶ 30). Officer Huggard told Mr. Parkinson that he just got off the phone with his parole officer who is on the way, and told him that he needed to step out of the vehicle. (SAC, ¶ 31). Mr. Parkinson told Officer Huggard that he would wait for his parole officer. (SAC, ¶ 32). Mr. Parkinson alleges that Officer Huggard then told him: "You're gonna get out of the car or I'm going to [] yank you out!" (SAC, ¶ 44). Mr. Parkinson reiterated that he was going to wait for his parole officer because he did not know who the men were. (SAC, ¶ 45). Mr. Parkinson claims that his parole officer was not contacted. (SAC, ¶¶ 33–34).

After indicating he would wait for his parole officer, Mr. Parkinson claims that Officer Huggard said he worked for Murray city and told him to get out of the car. (SAC, ¶ 46). Mr. Parkinson alleges that at as Officer Huggard gave this command, he grabbed the driver's side door handle, and when he discovered the door was locked, unlocked it through the open window. (SAC, ¶¶ 47, 49). Mr. Parkinson asserts that he did not give Officer Huggard permission to open the door, and that Officer Huggard then entered his vehicle without consent. (SAC, ¶ 48, 50). Mr. Parkinson claims that Officer Huggard then "attacked" him by grabbing his left wrist and arm and "twisting" it "at a painfully sharp angle," which injured his left shoulder. (SAC, ¶¶ 51–53). He asserts that during this incident he put his hand on the gear shifter to avoid being dragged from the vehicle and that as Officer Huggard continued to yank on his shoulder, the shifter was pulled from neutral into drive. (SAC, ¶¶ 58–59). The vehicle did not move at that time since his foot was on the brake. (SAC, ¶ 60). He claims that Office Sanderson then "drove [sic] head first" into his vehicle, landing on Mr. Parkinson's legs, and forcefully tried to remove his hand from the gear shifter. (SAC, ¶¶ 61–62). Mr. Parkinson states that his right knee buckled and his foot slipped off the brake pedal, causing the vehicle to roll forward. (SAC, ¶¶ 63–64). He claims he could not do anything to stop the vehicle because of how Officers Huggard and Sanderson "attacked him" and held him down. (SAC, ¶ 66). According to Parkinson, Officer Sanderson then grabbed the steering wheel and began turning it, and the car ultimately crashed against the curb on the opposite side of the road, damaging the car and injuring his neck and lower back. (SAC, ¶¶ 68–69, 73–75).

Once the vehicle hit the curb, Officers Huggard and Sanderson let go of the steering wheel and Mr. Parkinson's arm, and Mr. Parkinson regained control of the vehicle and ultimately parked the car about fifteen yards away in the first vacant parking stall. (SAC, ¶¶ 82–85). He

5

claims he then entered the hospital to be around other people since he feared for his life. (SAC, ¶ 86–87). Mr. Parkinson further alleges that after he entered the hospital, Officers Huggard and Sanderson "searched and seized his vehicle without his permission" or the permission of his mother, who owned the car. (SAC, ¶¶ 94.5, 94.6).

Mr. Parkinson claims that as a result of the "search and assault" on February 26, 2015, he "sustained lasting physical injuries and ongoing pain and suffering," he was "illegally arrested" on March 2, 2015, he was subsequently charged and convicted of two counts of aggravated assault on an officer in violation of Utah Code § 76-5-102.4(4), and one count of not stopping on the command of an officer in violation of Utah Code § 41-6a-210, his vehicle suffered severe damage, he lost his $60,000 a year job, he has now been wrongfully incarcerated for years, and he suffered and continues to suffer from emotional distress. (SAC, ¶¶ 88-94).

### B. MARCH 2, 2015 APARTMENT SEARCH

Mr. Parkinson rented the basement apartment in his mother's home. (SAC, ¶¶ 99–100). The basement apartment had a separate entrance at the rear of the house and a separate door connecting it to the upstairs kitchen. (SAC, ¶¶ 101–02). He claims that the door to the kitchen had a lock which remained locked at all times unless he opened it "for a specific reason," and that his mother "did not have permission or the authority" to go into the apartment without his express consent. (SAC, ¶¶ 103–04).

Mr. Parkinson alleges that he arrived at his home on March 2, 2015 at approximately 8:30 a.m. and spoke to his mother who informed him that a Murray City police officer, later identified as Detective Pearson, was "there at the house over the weekend looking for [him], and aggressively harassing her," and conveyed that she "was very concerned and scared." (SAC, ¶¶ 98, 105–07). Mr. Parkinson decided that he needed to go speak to his parole officer about the matter, and claims that as he was leaving, a uniformed officer "confronted" him, handcuffed him,

and placed him in a police vehicle. (SAC, ¶¶ 108–11). The police officers searched Mr. Parkinson before placing him in the police vehicle, and confiscated his wallet and cell phone. (SAC, ¶¶ 112–13). Mr. Parkinson claims that he watched as the officers counted the money from his wallet and overheard an officer say "We need some drugs to go with this money, go search his basement apartment." (SAC, ¶ 115). Mr. Parkinson asserts that Officer Huggard ordered Detective Pearson to search his basement apartment. (SAC, ¶¶ 118–19). Mr. Parkinson states that he did not give consent to Detective Pearson to enter his apartment, and that Detective Pearson did not have probable cause to enter the apartment. (SAC, ¶¶ 119-21).

Mr. Parkinson asserts that Detective Pearson entered his basement apartment alone, entered the bathroom alone, and exited the bathroom alone several minutes later with evidence allegedly discovered in the bathroom. (SAC, ¶¶ 125–27). Mr. Parkinson further asserts that, on information and belief, Detective Pearson "planted the alleged evidence he found" in the bathroom in an attempt to build a case against Mr. Parkinson to justify the defendants' actions on February 26, 2015. (SAC, ¶ 127).

### III.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014) (quoting *Twombly*, 550 U.S. at 547). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). In reviewing a 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded factual allegations and views the allegations in the light most favorable to the plaintiff. *Garling*, 849 F.3d 1289, 1292 (10th Cir. 2017). However, the court need not accept the plaintiff's conclusory allegations as true. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). "[A] plaintiff must offer

specific factual allegations to support each claim." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (citing *Twombly*, 550 U.S. at 555). A complaint survives only if it "'states a plausible claim for relief,'" though courts recognize that "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context." SAC at 1214–15 (quoting Iqbal, 556 U.S. at 679).

While a court must construe the filings of a pro se plaintiff "liberally" and hold them "to a less stringent standard than formal pleadings drafted by lawyers," *Hall*, 935 F.2d at 1110, a pro se plaintiff still must "'follow the same rules of procedure that govern other litigants.'" *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quoting *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994)). Thus, a pro se "plaintiff still has 'the burden of alleging sufficient facts on which a recognized legal claim could be based.'" *Jenkins v. Currier*, 514 F.3d 1030, 1032 (10th Cir. 2008) (quoting *Hall*, 935 F.2d at 1110). While the court must make some allowances for "the [pro se] plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements[,]" *Hall,* 935 F.2d at 1110, "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Garrett*, 425 F.3d at 840. Although Mr. Parkinson is now represented by counsel, his complaint was drafted pro se. As such, it will be reviewed under the standards governing pro se complaints.

### IV.  ANALYSIS

#### A. Plaintiff's Fourth Amendment Excessive Force Claim is Barred by *Heck v. Humphrey*

The defendants argue that all of Mr. Parkinson's claims are barred by *Heck v. Humphrey*, a case in which the Supreme Court held that a plaintiff cannot bring a claim under 42 U.S.C. §

8

1983 if success in the action would "necessarily imply the invalidity of his conviction or sentence." 512 U.S. 477, 487 (1994).

In Mr. Parkinson's state criminal proceedings, a jury convicted Mr. Parkinson on two counts of assaulting a police officer and one count of failing to respond to a police command. To convict Mr. Parkinson of assault on a police officer, the jury had to find that he assaulted a police officer using a "dangerous weapon" or "other means or force likely to produce death or serious bodily injury." See Utah Code § 76-5-102.4(2), (4).

These convictions—which have not been reversed or otherwise invalidated—obviously implicate Mr. Parkinson's excessive force claim. However, "[a]n excessive-force claim against an officer is not necessarily inconsistent with a conviction for assaulting the officer." *Havens v. Johnson*, 783 F.3d 776, 782 (10th Cir. 2015). "To determine the effect of *Heck* on an excessive-force claim, the court must compare the plaintiff's allegations to the offense he committed." *Id.* "Sometimes the excessive-force claim must be barred in its entirety because the theory of the claim is inconsistent with the prior conviction." *Id.*

Here, Mr. Parkinson's theory of recovery is plainly inconsistent with his state court conviction. The account he advances in the SAC, which portrays the defendants as having caused him to move his shifter to the "Drive" position and his foot to slip off the brake, is not at all consistent with his conviction for assaulting the officers. That account, if believed by the jury in the state court, would have precluded his conviction on two charges of assaulting a peace officer. Instead he was convicted, and he cannot now come to federal court seeking compensation under a theory that would render his state conviction invalid. Accordingly, Mr. Parkinson's excessive force claims are dismissed without prejudice. *See Fottler v. United States*, 73 F.3d 1064, 1065 (10th Cir.

9

1996) ("When a § 1983 claim is dismissed under *Heck*, the dismissal should be without prejudice.").

Defendants additionally argue that because Mr. Parkinson's claims are "interwoven and all part of the same saga," success on any one of his claims—even those that are premised on the search of his apartment four days later—would impugn the validity of his state conviction. But the court cannot find any elements of the crimes for which Mr. Parkinson was convicted that would be incompatible with his claims alleging unconstitutional searches or seizures of his car and apartment. As a result, Mr. Parkinson's remaining claims are not *Heck*-barred.

C. **QUALIFIED IMMUNITY OF THE DEFENDANTS**

"When a defendant raises a qualified immunity defense, the court must dismiss the action unless the plaintiff shows that (1) the defendant violated a statutory or constitutional right, and (2) the right was clearly established at the time of the violation." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). A court "may address these requirements in any order." *Id.* "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). The clearly established prong will be met if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010)).

As a preliminary matter in the qualified immunity analysis, the court must conclude whether, as defendants suggest, it may appropriately consider Mr. Parkinson's parole agreement in resolving this motion. In general, when a Rule 12(b)(6) movant seeks to rely on documents or other evidence outside the complaint, the court will either exclude those materials or, with proper

notice and an opportunity for the non-movant to respond, convert the motion into a motion for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d). There is a limited exception to this rule under which "[c]ourts are permitted to review documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013) (internal quotation marks omitted). As Mr. Parkinson correctly points out, however, his SAC does not refer to his parole agreement, and the SAC's allusions to his status as a parolee will not avail the defendants of this exception.

Nevertheless, the contents of the parole agreement relevant to the defendants' qualified immunity are prescribed by Utah law, of which the court may take judicial notice. And as explained below, that state law, at least in part, shapes the scope of Mr. Parkinson's Fourth Amendment rights as a parolee. Utah Code § 77-23-301(1) provides that:

> (1) An inmate who is eligible for release on parole shall, as a condition of parole, sign an agreement as described in Subsection (2) that the inmate, while on parole, is subject to search or seizure of the inmate's person, property, place of temporary or permanent residence, vehicle, or personal effects while on parole:
>
> > (a) by a parole officer at any time, with or without a search warrant, and with or without cause; and
> >
> > (b) by a law enforcement officer at any time, with or without a search warrant, and with or without cause, but subject to Subsection (3).

Subsection (3) constrains a law enforcement officer's authority to search a parolee's residence:

> (3)(a) In order for a law enforcement officer to conduct a search of a parolee's residence under Subsection (1) or a seizure pursuant to the search, the law enforcement officer shall have obtained prior approval from a parole officer or shall have a warrant for the search.

§ 77-23-301(3).

Having concluded that this statute—but not Mr. Parkinson's parole agreement—is properly before the court, the court turns to the qualified immunity analysis for both the traffic stop and apartment search.

### A. REMAINING FOURTH AMENDMENT CLAIMS ARISING FROM THE FEBRUARY 26, 2015 TRAFFIC STOP

The court construes the SAC as alleging three separate searches and seizures within the February 26, 2015 traffic stop consisting of (1) a seizure effected by the initial traffic stop; (2) a search when Officer Huggard intruded into Mr. Parkinson's vehicle and opened the door from the inside; and (3) a search of the vehicle after Mr. Parkinson "got out of the vehicle and hurried into the hospital so as to be around other people that could witness these unknown men attacking him." (SAC, ¶ 86).

In *Samson v. California*, the Supreme Court held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee[,]" at least when state law authorizes such a search. 547 U.S. 843, 857 (2006). "Thus, '[p]arolee searches are . . . an example of the rare instance in which the contours of a federal constitutional right are determined, in part, by the content of state law." *United States v. Mabry*, 728 F.3d 1163, 1167 (10th Cir. 2013) (alteration in original).

The Supreme Court's decision in *Sampson* is sufficient to avail Officers Huggard and Sanderson of qualified immunity for any searches that occurred after they became aware of Mr. Parkinson's parolee status. Under Utah law, Mr. Parkinson's person, property, vehicle, and personal effects were subject to search or seizure "by a law enforcement officer at any time, with or without a search warrant, and with or without cause[.]" Utah Code § 77-23-301(1)(b). The SAC makes clear that defendants were aware that Mr. Parkinson was on parole before they asked him to exit his vehicle. (SAC, ¶ 31). Accordingly, Mr. Parkinson's allegation that Officer Huggard

subsequently "put his left arm through the open window without Parkinson's permission and unlocked the door manually" does not adequately allege a constitutional violation because Mr. Parkinson had no Fourth Amendment right to be free from that search. The same reasoning applies to establish the Defendants' qualified immunity for the alleged search of Mr. Parkinson's car after these events. As a result, insofar as Mr. Parkinson's SAC seeks to hold defendants liable for these two searches, the defendants' motion to dismiss must be granted.

However, Officer Sanderson is not entitled to qualified immunity if Mr. Parkinson has alleged a prima facie unconstitutional seizure in the form of a traffic stop without an objectively reasonable suspicion. The Fourth Amendment, incorporated against the states by the Fourteenth Amendment's due process clause, protects against unreasonable searches and seizures. A traffic stop amounts to an unreasonable seizure if the officer conducting the stop lacks a "reasonable suspicion" that criminal activity is afoot. *See United States v. Cortez-Galaviz*, 495 F.3d 1203, 1205–06 (10th Cir. 2007). "To satisfy the reasonable suspicion standard, an officer must have a 'particularized and objective' basis for thinking the detained individual is involved in criminal activity." *Id.* at 1206 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Courts "evaluate the reasonableness of searches and seizures based on the facts known to officers when the event in question occurred[.]" *United States v. Harris*, 735 F.3d 1187, 1191 (10th Cir. 2013).

On the basis of facts alleged in the SAC, Officer Sanderson was not aware of Mr. Parkinson's parolee status when he initiated the traffic stop. Moreover, the SAC alleges that Officer Sanderson's avowed predicate for the traffic stop was Mr. Parkinson's failure to use a turn signal. Accepting, as the court must on a motion to dismiss, Mr. Parkinson's allegation that he had in fact "used his turn signal properly at all relevant times," (SAC, ¶ 21), the court finds that he has

pled facts as to the initial traffic stop that are sufficient to establish Officer Sanderson's violation of his constitutional right to be free from unreasonable seizures.

As to the second step of the qualified immunity analysis, it would seem beyond dispute that there is a clearly established right under the Fourth Amendment to be free from a traffic stop that is not supported by reasonable suspicion. *See, e.g.*, *United States v. Neff*, 681 F.3d 1134 (10th Cir. 2012) (finding that Fourth Amendment is violated where totality of circumstances does not support a reasonable suspicion to effect traffic stop). At least at this motion to dismiss stage—in which a more fulsome review of the totality of the circumstances is not possible—the court finds that Officer Sanderson is not entitled to qualified immunity on this claim.[3]

### B. FOURTH AMENDMENT CLAIM ARISING FROM THE MARCH 2, 2015 APARTMENT SEARCH

Defendants argue that they are entitled to qualified immunity for the March 2, 2015 search of Mr. Parkinson's apartment because of the same Utah statute that rendered them immune for some of the earlier searches. This search presents a closer call than the traffic stop searches, however, because as explained above, Utah Code § 77-23-301(3)(a) imposes a constraint on a warrantless search of a parolee's *residence* if conducted by a law enforcement officer: "In order for a law enforcement officer to conduct a search of a parolee's residence . . . the law enforcement officer shall have obtained prior approval from a parole officer[.]" § 77-23-301(3)(a). This presents the highly complex question of whether the officers' alleged failure to obtain approval from a

---

[3] The court notes that this claim appears potentially vulnerable to a lurking collateral estoppel issue under *Allen v. McCurry*, 449 U.S. 90 (1980). In *Allen*, the Supreme Court held that § 1983 plaintiffs do not enjoy an exemption from the preclusive effect of state court judgments, whether civil or criminal. If Mr. Parkinson had an opportunity to fully and fairly litigate the issue of Officer Sanderson's reasonable suspicion before the state trial court, he may well be estopped from relitigating the same before this court. In the absence of any briefing on this precise question, and because this motion presents an inapt posture for this sort of determination, the court leaves this collateral estoppel issue for future proceedings.

parole officer prior to searching Mr. Parkinson's residence amounts to a violation of his Fourth Amendment rights.

But the court need not analyze that issue here because, regardless of its answer, the court finds that such a right is not clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 236, 237 (2009) (holding that in a case "in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right[,] a district court may elect to address only the second prong of qualified immunity). As explained above, parolee searches present the rare instance in which state law informs the contours of federal constitutional law. However, the dual sources of law are not coextensive. Rather, a state statute governing parolee searches represents the floor, but not necessarily the ceiling, of constitutionally permissible parolee searches. Stated differently, noncompliance with a state's parolee search statute is not fatal to the constitutionality of the search.

This is so, in part, because the Supreme Court has found that parole, as "an established variation on imprisonment of convicted criminals[,]" carries with it a significantly diminished expectation of privacy. *Samson*, 547 U.S. at 850. Indeed, in holding that a suspicionless search of a parolee did not violate the Fourth Amendment, the Court left open the question of whether a sufficiently broad consent-to-search provision of a parole agreement may even effect a complete waiver of a parolee's Fourth Amendment rights. *Samson*, 547 U.S. 852 n.3.

In at least two cases from the Tenth Circuit Court of Appeals, searches of a parolee's residence have been held permissible under the Fourth Amendment notwithstanding that they did not comply with state law governing parolee searches. In *Mabry*, the Tenth Circuit rejected a parolee's argument—indistinguishable from Mr. Parkinson's—that law enforcement's search of his residence violated the Fourth Amendment because those conducting the search failed to get

prior approval as required by Kansas law. *Mabry*, 728 F.3d at 1169. The court concluded that "when considered in the light of the totality of the circumstances, the alleged failure to get prior permission . . . had a minimal impact on Mr. Mabry's expectation of privacy and the State's interest in supervising him." *Id.*

In *United States v. Tucker*, the Tenth Circuit explained that "a parole search may be upheld if it is conducted pursuant to a state parole/probation system[,]" but that such a system "is not the exclusive avenue by which the search may be deemed reasonable under the Fourth Amendment." 305 F.3d 1193, 1200 (10th Cir. 2002). Pursuant to that reasoning, the court rejected the parolee's "argument that the search of his home was necessarily invalid because it did not comply with state law governing parole searches." *Mabry*, 728 F.3d at 1169 (summarizing *Tucker*).

Utah's parolee search statute is exceedingly broad. Like the statute deemed permissible by the Court in *Samson*, it permits wholly suspicionless searches of a parolee's residence by both parole officers and law enforcement.[4] Given the Tenth Circuit's willingness to permit less-than-perfect compliance with procedural requirements of parolee search statutes—including one case that involved substantially the same state-law defect as that alleged here—the court cannot say that a reasonable officer would be on notice that a failure to obtain approval before searching a parolee's residence would violate the Fourth Amendment.

The court assumes that a parolee retains some measure of Fourth Amendment protections. And there is surely room for debate as to whether the factual circumstances here are distinguishable

---

[4] The *Samson* Court further concluded that the state statute's "prohibition on 'arbitrary, capricious or harassing' searches" was sufficient to constrain the otherwise unbridled discretion of law enforcement in conducting suspicionless parolee searches. *Samson*, 547 U.S. at 856. The Utah statute similarly contains a limitation that parolee searches not be conducted "for the purpose of harassment." Utah Code § 77-23-301.

16

from *Mabry* and *Tucker*.[5] But against this body of Supreme Court and Tenth Circuit precedent, it cannot be said that the search of Mr. Parkinson's apartment without prior approval by a parole officer violated a right that is so "clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S. Ct. at 308. As a result, Officer Huggard and Detective Pearson are immune from this claim.

### D. IS THE REMAINING CLAIM ADEQUATELY PLEADED?

Defendants argue that even if certain counts evade their qualified immunity and *Heck* defenses, the SAC's factual allegations have not "nudged [his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. The only cause of action remaining is an unlawful seizure claim against Officer Sanderson.[6] Defendants appear to argue that the pleading defect in this claim is that the SAC alleges only that Mr. Parkinson had not committed a traffic infraction. Defendants suggest that, to withstand a motion to dismiss, Mr. Parkinson needed to have alleged that Officer Sanderson lacked "a reasonable articulable suspicion that [he] violated any of the traffic or equipment regulations of the jurisdiction." (ECF No. 34 at 22). The court cannot see how such an allegation differs from the formulaic recitations the Supreme Court has directed courts to reject.

To the extent that defendants actually mean that Mr. Parkinson was required to rule out other potential sources of Officer Huggard's reasonable suspicion, the court can easily dispense with such an argument. Mr. Parkinson is not required to anticipate defenses that might be raised

---

[5] *Mabry* and *Tucker* each involved statutes that imposed a reasonable suspicion requirement on parolee searches. The statute in effect at the time of these events contains no such requirement.

[6] The SAC asserts Count I against Officers Huggard and Sanderson. As a result of the court's qualified immunity rulings, however, only the initial traffic stop remains pending. As to that search, the SAC states a claim only against Officer Sanderson—the individual who is alleged to have made the traffic stop. (*See* SAC, ¶¶ 13–25).

by the defendants. And if Officer Huggard had in fact formed a reasonable suspicion on the basis of other facts, he will surely alert the court to those arguments in a more appropriate motion.

But the defendants chose to bring a motion to dismiss, which tests the sufficiency of the complaint. Mr. Parkinson's SAC alleged that Officer Huggard told him he was pulled over for failing to use a turn signal. The SAC further alleged that Mr. Parkinson *had* used his turn signal at all proper times. The court finds that these allegations are "enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

## V. ORDER

For the reasons above, the defendants' Motion to Dismiss is GRANTED in part and DENIED in part. Specifically:

1. Defendants' Motion to Dismiss Count I of the Second Amended Complaint is **DENIED** insofar as Plaintiff may maintain a claim against Officer Sanderson for the allegedly unlawful traffic stop. For all other Fourth Amendment claims in Count I, Defendants' Motion to Dismiss is **GRANTED**. Plaintiff's excessive force claim is **DISMISSED WITHOUT PREJUDICE**, but Plaintiff's other unlawful search claims from which Defendants are immune are **DISMISSED WITH PREJUDICE.**

2. Defendants' Motion to Dismiss is **GRANTED** with respect to Counts II, III, IV, and V of the Second Amended Complaint. Those claims are **DISMISSED WITH PREJUDICE.**

Signed September 28, 2018

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge